# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 348 | **DATE** | 1/8/2002 |
| **CASE TITLE** | USA vs. Michael Spano et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER (Concerning the Organized Crime" Allegation in the Indictment): Defendants' motion to strike is granted, and paragraph 1(q) is hereby stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

JAN 15 2002
date docketed

docketing deputy initials

1/14/2002
date mailed notice

AMM
mailing deputy initials

Document Number

101

AMM

courtroom deputy's initials

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| Plaintiff, | ) | No. 01 CR 348 |
| | ) | |
| v. | ) | Hon. John F. Grady |
| | ) | |
| MICHAEL SPANO, SR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER
### (Concerning the "Organized Crime" Allegation in the Indictment)

The indictment in this case alleges, in a multiplicity of
counts, that the defendants conspired to defraud the Town of Cicero
by causing it to pay for fictitious insurance services which
defendants pretended had been performed for the Town by Specialty
Risk Consultants, Inc., an enterprise formed and controlled by some
of the defendants.  Count I alleges a RICO conspiracy in which
Specialty Risk Consultants, Inc. ("SRC") was the enterprise through
which the defendants conducted a pattern of racketeering activity
consisting of offenses under the federal mail and wire fraud
statutes as well as money laundering, state law bribery, and
interstate transportation of stolen property.  Some of the
racketeering acts are alleged as separate mail and wire fraud
counts of the indictment.  In addition, the indictment contains a
number of tax counts charging the individual defendants with
evading taxes for various years on the proceeds of the fraud
against the Town.

/01

In a section of Count I describing each of the defendants and the role he or she played in the conspiracy, the following statement appears:

### Organized Crime

"(q) Frank Maltese and Michael Spano, Sr. were associated with organized crime in the Chicago area and used their organized crime relationship to influence the operations of the Cicero Town government."

This is the only place in the indictment where the phrase "organized crime" is used. Nowhere in the indictment is the term defined. Neither is there any factual allegation of any acts necessarily associated with "organized crime," as opposed to the "ordinary" type of criminal activity involved in a typical mail and wire fraud scheme.

The defendants have moved to strike the "organized crime" language from the indictment on the basis that it is irrelevant, immaterial and unfairly prejudicial to them. In response to the motion, the government has filed a proffer of the evidence it believes will prove the relevance and materiality of the allegation.

The proffer recites that the defendant Betty Loren-Maltese is the widow of Frank Maltese, who was Cicero Town Assessor from 1985 until 1993. In 1991, Frank Maltese pled guilty to a gambling conspiracy involving a bookmaking operation headed by Rocco Infelice. During his plea colloquy, Maltese admitted that, "through his position as a public official with the Town of

Cicero," he was able to provide Infelice with notice of an intended police raid "on a tavern owned by a relative of an individual associated with the Infelice wagering business." Further, in the summer of 1988, Infelice asked Maltese to discuss a bribe with a Cook County judge presiding over a case involving William Jahoda, "one of Infelice's managers in the wagering business."

The proffer goes on to say that the defendant Michael Spano, Sr.'s brother, Paul Spano, also pled guilty in the Infelice case. Paul admitted in his plea agreement that he allowed Flash Interstate Delivery Systems, Inc., at 1505 Laramie in Cicero, to be used as a base of gambling operations by a street crew headed by Joseph Ferriola, one of Infelice's associates. Among the crew members who met with Infelice and Ferriola at Flash Delivery were Louis Marino, Salvatore DeLaurentis, Robert Bellavia, Frank Maltese and William Jahoda. Paul Spano further admitted that he was told to remove $5,000.00 in cash from an envelope kept in the Flash safe and deliver it to "Johnny Apes." The proffer identifies Johnny Apes as John Monteleone, "an organized crime associate of Ferriola and Infelice."

After his indictment in the Infelice case, Paul Spano sold the property at 1505 S. Laramie to John Lagiglio, one of the defendants in this case. After the sale, Lagiglio and defendant Michael Spano, Sr. operated a trucking business at the Laramie address, changing the name successively over time from Rail Cartage, to

- 4 -

Piggy Back Specialists, to Dispatch Services.

The proffer asserts that after SRC obtained Cicero's insurance business in 1992, some $200,000.00 of Cicero's insurance funds were transferred by SRC "to Lagiglio and Spano's trucking firm at 1505 S. Laramie." (We assume the government intends to say that the transfer was, in effect, a theft of Town funds.)

One of the defendants in this case is Gregory Ross. The government proffer states that Ross, an accountant, was an associate of Robert Bellavia and Rocco Infelice. According to Ross, "Infelice was in charge of organized crime's operations in the town of Cicero."[1]

According to the proffer, Bellavia and Infelice introduced the defendant Ross to the defendant Michael Spano, Sr. The proffer continues with the following statement, without indicating what evidence supports it: "After Infelice's conviction for racketeering in 1991, defendant Michael Spano, Sr. succeeded Infelice as the head of organized crime's interests in Cicero." The proffer continues with the statement that on one of the visits that

---

[1] We assume this means that Ross told this to someone, but the proffer does not indicate who it was or how the statement attributed to Ross would be admissible against any of the other defendants. Neither does the proffer indicate what is meant by "organized crime's operations in the town of Cicero." "Organized crime" is commonly thought to involve such activities as gambling, loansharking, extortion, bribery of public officials and sometimes prostitution and other vice operations. What the government has in mind when it talks about "organized crime" in relation to this case is unspecified, except that we know the Infelice operation involved bookmaking. Whether the defendant Ross had anything more than that in mind when he allegedly stated that "Infelice was in charge of organized crime's operations in the town of Cicero" is something the government's proffer does not tell us.

defendants Ross and Spano, Sr. made to Infelice in prison, "Infelice told Ross to do whatever Spano Sr. wanted him to do." Perhaps this is the evidence the government regards as supporting the statement that "Michael Spano, Sr. succeeded Infelice as the head of organized crime's interests in Cicero."

While Infelice was incarcerated, he telephoned Spano, Sr. at 1505 S. Laramie "on a regular basis." Apparently the calls were not overheard, because the proffer makes no mention of what was said.

Spano, Sr. withdrew $100,000 of Infelice's bank funds "in violation of a federal court order," and on another occasion Spano, Sr. "asked an associate to inquire into the possibility of bribing high-ranking federal officials for a pardon or clemency for Infelice."

In 1992 defendant Michael Spano, Sr. told defendant Ross that "Frank Maltese had agreed to give Cicero's insurance business to Spano, Sr. and John Lagiglio." The defendant Frank Taylor was hired to manage SRC for Spano, Sr. and Lagiglio. Spano, Sr. told Ross that Taylor was a "stand-up guy" who could be trusted because his father had been in jail with one of Spano's friends. Taylor himself stated that his father was a bookmaker "affiliated with organized crime figure Joseph Ferriola."

In late 1992 or early 1993, a town employee expressed concerns about SRC's billings to Frank Maltese at a restaurant. The

defendant Spano, Sr. joined the employee and Maltese at their table and asked the employee "What is your problem ... why can't you do what you are told?"

The proffer goes on to recite that on January 12, 1993, Frank Maltese and defendant Joseph DeChicio "orchestrated Betty Loren-Maltese's appointment as interim town president through a series of planned maneuvers." (None of the "maneuvers" had any apparent connection with "organized crime.")

There was an occasion when a town employee told the defendant Emil Schullo that it appeared the mob had taken over the town's insurance business. The employee was then summoned to a meeting with town president Betty Loren-Maltese, who inquired whether the employee had told anyone else of his concern. The employee did not answer the question and was shortly thereafter transferred out of the insurance department. The following year, the defendant DeChicio terminated the employee.

After the defendant Taylor was hired to manage SRC, Lagiglio told him that he and Taylor had to "kick back $7,000 a month to Spano, Sr." The proffer continues that Spano, Sr. told Ross "that every one who did business with the Town had to kick back 15% to him, which he split with Betty Loren-Maltese and Emil Schullo." Spano, Sr. told Taylor that he was sharing the SRC kickback with others.

In late 1994, the defendant Charles Schneider informed Taylor

that he was taking over control of SRC on the instructions of Michael Spano, Sr. "Schneider told Taylor that he would not put his life on the line without total control of SRC because he was working for a guy they called 'Apes,'" a reference to 'Johnnie Apes' Monteleone.

In approximately 1995, Spano, Sr. told Ross that Monteleone was the boss of the Chicago "outfit" and Spano's boss.

At page 10 of its proffer, the government quotes "a consensually recorded conversation" which, in its view, is a reference by the defendant Spano, Sr. to "Betty Loren-Maltese's role with organized crime's control of the town's insurance business. . . ." We have read and reread this quotation and can see no suggestion of any relationship among Betty Loren-Maltese, organized crime and the town's insurance business.

## Discussion

Taking the proffer in the light most favorable to the government, it shows that Frank Maltese was an associate of Rocco Infelice in an illegal gambling business. Frank is the deceased husband of the defendant Betty Loren-Maltese, and was instrumental in hiring SRC to handle the town's insurance business. He also played a role in the installation of Betty Loren-Maltese as interim town president, after SRC had been hired.

The government has offered no evidence that Frank Maltese's association with Rocco Infelice, his involvement in the gambling

operation, or his association with any of the other persons named as part of the Infelice operation had anything to do with SRC being hired or with the fraud committed against the town through the instrumentality of SRC. From all that appears from the government's proffer, Frank Maltese could have done everything he did that is relevant to the charges in this case without having had any association whatever with Infelice or any of Infelice's associates.

As far as the Spanos are concerned, the government furnishes no closer connection between "organized crime" and the charges in this case. Paul Spano is not a defendant, nor is he alleged to have been a co-conspirator. In the government's view of the case, Paul's role seems to be that he furnishes a connection between the Infelice gambling operation and his brother Michael Spano, Sr. who is a defendant. The connection between Paul and this case is that he sold the premises at 1505 S. Laramie to Michael, Sr. and the defendant John Lagiglio, who then used it as a trucking business into which some of the Town funds were funneled through SRC. Assuming all of this to be true, it establishes no connection between Michael, Sr. and Lagiglio on the one hand and "organized crime" on the other. The fact that the Laramie street premises were used by the Infelice gambling operation is simply immaterial to the charges in this case.

Assuming the government could establish that Rocco Infelice

"was in charge of organized crime's operation in the town of Cicero," and that after Infelice's conviction "defendant Michael Spano, Sr. succeeded Infelice as head of organized crime's interests in Cicero," we do not see how this would tend to prove any of the allegations of the indictment. Infelice had nothing to do with the scheme to bilk the town of the insurance funds, so whether he had ever been in charge of anything in Cicero is irrelevant. As for Michael Spano, Sr., his alleged succession to Infelice's leadership of "organized crime's interests in Cicero" is not alleged in the indictment, nor shown in the proffer, to have had anything to do with the conspiracy or scheme to defraud the town. Evidence that Infelice told the defendant Ross "to do whatever Spano, Sr. wanted him to do," is, again, not shown to have any relationship to the charges in the indictment.

Michael Spano, Sr.'s withdrawal of $100,000 in violation of a federal court order, and his alleged exploration of the possibility of bribing someone to obtain clemency for Infelice, shows a connection to Infelice but has no bearing on the conspiracy to defraud the town.

Spano, Sr.'s vouching for Frank Taylor as a manager for SRC because Taylor was a "stand-up guy" due to his father's affiliation with "organized crime figure Joseph Ferriola" does not show that either Spano, Sr. or Taylor did anything with relation to SRC that was connected in any way with "organized crime." The phrase

"stand-up guy" seems to imply no more than that Taylor could be counted on to carry out the scheme to defraud the Town, and perhaps be relied on not to inform on his co-conspirators. But the selection of a manager on this basis would be typical of any criminal enterprise and is certainly not a function peculiar to "organized crime."

The incident where Spano, Sr. asked the inquisitive town employee "What is your problem . . . why can't you do what you are told," is perhaps evidence of Spano, Sr.'s involvement in the fraudulent scheme, but we do not see it as evidence of his use of any connection he may have had with organized crime. The proffer does not explain the government's view of the incident's significance, but we assume the government regards it as an effort to pressure the employee or even to convey an implied threat of some kind. But even interpreting the incident in that way, it does not smack of organized crime activity. Conspirators commonly discourage efforts to discover their purpose or interfere with their progress. That does not transform their conspiracy into an organized crime activity.

The "orchestration" of Betty Loren-Maltese's appointment as interim Town president by a "series of planned maneuvers," does not suggest any influence of organized crime. It is not even clear what relevance the "maneuvers" have to the charges in the indictment. The scheme was already well underway by January 12,

1993, when Loren-Maltese became interim president, and her attaining that office apparently had nothing to do with the hiring of SRC to handle the town's insurance business. The fact that Loren-Maltese was interim president, and later president, would be relevant to how the conspiracy was carried out, but the relevant fact would seem to be that Loren-Maltese held the office, not how she acquired it.[2/]

The incident involving the town employee who spoke to the defendant Schullo about his belief that "the mob" had taken over the town's insurance business, and who was then interrogated by Loren-Maltese, transferred out of the insurance department, and ultimately terminated by the defendant DeChicio is evidence of communication among the defendants Schullo, Loren-Maltese and DeChicio. It also tends to show that they were offended by the employee's suggestion. But it is not evidence that "the mob" had in fact taken over Cicero's insurance business nor that any of the three defendants was in any way connected with "the mob."

The statement by the defendant Lagiglio to Frank Taylor that Lagiglio and Taylor had to kick back $7,000 a month to Spano, Sr., tends to support the conspiracy allegations to the indictment, but it does not show an "organized crime" connection to the conspiracy.

Spano, Sr.'s alleged statement to Ross that everyone who did

---

[2/]    The relevance of the "maneuvers" of January 12, 1993, apart from whether they suggest organized crime activity is not before the court on the present motion.

business with the Town had to kick back 15% to him, which he split
with Loren-Maltese and Schullo does not tend to prove that Spano,
Sr. was acting as a member of "organized crime." If true, it shows
that Spano, Sr. had enormous influence in the town, but it does not
suggest that the influence had anything to do with Spano, Sr.'s
alleged association with Rocco Infelice or any of the other alleged
organized crime members mentioned in the government's proffer.[3/]

The defendant Charles Schneider's alleged statement to Frank
Taylor that Schneider "would not put his life on the line without
total control of SRC because he was working for a guy they called
'Apes,'" is, according to the proffer, a reference to John
Monteleone, an associate of Infelice and Ferriola in the illegal
gambling business. The statement implies that Schneider was in
fear of Monteleone, so that he needed total control over SRC in
order to run it in a way that would not disappoint Monteleone.
This alleged statement by Schneider is the closest that any of the
evidence in the government's proffer comes to establishing an
"organized crime" connection with the insurance fraud. It would
presumably be offered by the government as a statement by Schneider
in furtherance of the conspiracy. It is not self-evident to the
court that the statement does in fact qualify as one made in

---

[3/] We are assuming that the $7,000 a month kickback had to do with SRC,
since it involved Lagiglio and Taylor, who owned and managed SRC. We are less
clear that the 15% kickback from "every one who did business with the Town" is
related to the indictment. All we are holding at this point is that it does not
support the organized crime allegation. Whether it would be admissible as
evidence directly supporting the charges in the indictment, or on some other
theory, is a question we do not address at this time.

furtherance of the conspiracy. Not every statement made by a conspirator has that purpose or effect, and we are not clear as to the circumstances of the conversation between Schneider and Taylor. It occurred in "mid to late 1994" according to the proffer. The indictment alleges that the conspiracy began in February of 1992. The government has filed a bill of particulars describing all of the false invoices submitted by SRC to the town, and the latest of the invoices for which a date is given was in 1993, over a year prior to the conversation between Schneider and Taylor.

Assuming that the statement is admissible, the next question is whether it is sufficient to support the allegation in Count I that "Frank Maltese and Michael Spano, Sr. were associated with organized crime in the Chicago area and used their organized crime relationship to influence the operations of the Cicero Town government." We think it is not. Schneider's statement about working for Johnnie Apes, and putting his life on the line by so doing, says a lot about Schneider's view of John Monteleone, and even tends to show Monteleone had some control over the operations of SRC. But it does not tend to prove that anyone beyond Monteleone was involved, and does not open the door to testimony about people like Infelice, Ferriola and the other members of "organized crime." Neither does it tend to show that Frank Maltese (who had died in December of 1992) or Spano, Sr. "were associated with organized crime in the Chicago area and used their organized

crime relationship to influence the operations of the Cicero Town government." In short, Monteleone's connection with Schneider and SRC is simply that — a connection of Monteleone. What else Monteleone did, and with whom, is not shown or implied by Schneider's statement to Taylor.

We do not have enough information to rule on the admissibility of Schneider's statement at this time, but we do rule that in no event will this be evidence sufficient to support the organized crime allegation.

The proffer recites that in approximately 1995 Spano, Sr. told the defendant Gregory Ross "that Monteleone was the boss of the Chicago 'outfit' and Spano's boss." The circumstances of the statement are not described, and there is no indication that it was a statement in furtherance of the conspiracy. It occurred, according to the proffer, after Ross, at Spano Sr.'s request, had met with Monteleone "to discuss a tax matter." The proffer does not indicate that the tax matter had anything to do with the insurance fraud or that Spano's statement about his relationship with Monteleone was related to the insurance fraud.

### Conclusion

The government has failed to satisfy the court that the "organized crime" allegation in the indictment is relevant and material to the scheme and conspiracy charged. The evidence proferred by the government does not show that Frank Maltese or

Michael Spano, Sr. used any connections they had with "organized crime" to control the operations of the Cicero town government and thereby to facilitate the scheme and conspiracy. The proffer does show that Frank Maltese and Spano, Sr. had associations with various persons convicted of an illegal gambling operation. But the gambling operation is completely unrelated to the fraud against the Town of Cicero. If John Monteleone was a member of the conspiracy against the Town (as asserted in the Bill of Particulars), his participation is relevant because of whatever he may have done to further the objects of the conspiracy, not because he was also a member of a gambling operation having no connection to the conspiracy.

Even if it could plausibly be argued that there is some marginal relevance to the organized crime allegation, and the evidence the government would offer in support of it, any such relevance is vastly outweighed by the prejudicial effect the evidence would have on the defendants. Rule 403 of the Federal Rules of Evidence counsels that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury....

That is the situation here. The evidence the government proposes to offer would have no tendency to prove that any of the defendants actually did engage in the RICO conspiracy, the fraudulent scheme,

or the tax violations alleged in the indictment. Whether the defendants did these things has nothing to do with whether Michael Spano, Sr. or Frank Maltese had associations with persons involved in an illegal gambling business. The evidence of those associations would be prejudicial to Spano, Sr. as well as the other defendants. Most of the defendants had no connection at all with the gambling operation, and yet they would sit through a trial where the activities of persons such as Rocco Infelice, James Ferriola, Louis Marino, Salvatore DeLaurentis, Robert Bellavia and William Jahoda would be a major focus. More than that, the defendants would have to deal with the government's contention that they were involved not simply with gamblers but with "organized crime." There is no way of predicting what criminal activities the jurors might think were encompassed by this term and no way of either limiting or measuring the prejudice to the defendants.

The defendants are entitled to a fair trial. They could not receive it if the government were permitted to proceed with the evidence it wishes to offer in support of the organized crime allegation.

The court finds that the organized crime allegation in paragraph 1(q) of Count I of the indictment is irrelevant, immaterial and unfairly prejudicial to the defendants. Accordingly, the defendants' motion to strike is granted, and paragraph 1(q) is hereby stricken.

Date:        January 8, 2002

ENTER:       _____
             John F. Grady, United States District Judge