# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 CR 348 | **DATE** | 12/29/2003 |
| **CASE TITLE** | United States of America vs. Spano, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   The motion of the defendants for a new trial based on newly discovered evidence pursuant to Rule 33 of the Federal Rules of Criminal Procedure is denied. The defendants' alternative motions for an evidentiary hearing are also denied.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| x | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | DEC 29 2003 | docketing deputy initials | 666 |
| | Docketing to mail notices. | U.S. DISTRICT COURT | | |
| | Mail AO 450 form. | | date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,              )
                                       DOCKETED
            Plaintiff,                 )

                                       DEC 2 9 2003
     v.                                )              No. 01 CR 348
                                       )
MICHAEL SPANO, SR., et al.,            )
                                       )
            Defendants.                )

### MEMORANDUM OPINION

The court has under advisement the motions of the defendants

for a new trial based on newly discovered evidence, pursuant to

Rule 33(b)(1) of the Federal Rules of Criminal Procedure.[1]  The

newly discovered evidence relied on by the defendants is a motion

and affidavit filed by an imprisoned co-defendant, Frank Taylor,

seeking to amend his presentence report to reflect that he was

abusing alcohol and marijuana from around 1970 up until the time of

his arrest "in this matter."[2]  Taylor pled guilty and testified

against the moving defendants, who argue that the new evidence so

undermines Taylor's credibility as to entitle them to a new trial.

### BACKGROUND AND OBSERVATIONS

### A.  Taylor's Testimony

The defendants argue correctly that Taylor was an extremely

---

1/ All defendants have adopted the others' motions and briefs, and we will
consider all arguments as having been joined in by all defendants.

2/ The parties disagree about whether "this matter" refers to the present
case or Taylor's earlier federal case in the District of Minnesota.

important government witness. He was an "insider" in the scheme to defraud the Town of Cicero, and, in testimony that extended over five days, described the scheme in great detail. It appears from the verdict that the jury found him to be a credible witness.

Taylor's plea agreement obligated the government to recommend a substantially reduced sentence in return for his cooperation. The theory of the defense at trial was that Taylor was lying in order to obtain the leniency promised in the plea agreement. The defendants argued to the jury that Taylor was a habitual liar. He admitted two prior instances of perjury. There was no suggestion by the defendants that Taylor was simply mistaken or confused, or that he was hampered by faulty perception or a poor memory. Rather, the position of all defendants was that Taylor was intentionally giving false testimony against them in order to lessen his own punishment.

The court's impression was that Taylor appeared to have an excellent recollection of the events about which he was testifying and that the occasional mistakes brought to his attention on cross-examination were not surprising in view of the fact that almost a decade had elapsed since those events. As far as his demeanor was concerned, Taylor seemed to be an intelligent, cooperative witness, equally responsive to questions by the prosecution and the defense. There was no apparent confusion or lack of comprehension. Whether

he was telling the truth or not was, of course, for the jury to decide.

## B.   **Taylor's Presentence Investigation and Sentencing**

In his presentence interviews with probation officer Kelly Rice, Taylor stated that in the early 1980s he was addicted to alcohol and cocaine, and had used Valium and marijuana. He related that he had completed an inpatient alcohol program in December of 1982. The presentence report noted that "Mr. Taylor stated that he has not used drugs or consumed alcohol since that time." (Government's Consolidated Response to Defendants' Motions for New Trial ("Government's Response"), Ex. 1.)

In sentencing Taylor, we expressed our view that he had been a credible witness at trial and had lived up to his part of the plea bargain.   We sentenced him to a term of 34 months, to be followed by a term of 3 years supervised release.

## C.   **The Bureau of Prisons's Policy Concerning Drug Treatment**

The Federal Bureau of Prisons (the "BOP") has a policy of early release for prisoners who successfully complete a program of drug treatment. Pursuant to 18 U.S.C. § 3621(e)(2)(B), the BOP may reduce the custody time by up to one year. There are certain requirements for entry into the program, including, not surprisingly, that "[t]he inmate must have a verifiable documented drug abuse problem." (Government's Response, Ex. 14, BOP Program Statement 5330.10, Chapter 5.4.1(a)(1).) The procedure is that the

drug abuse program staff conducts an interview of the inmate to "determine if the inmate has a substance abuse disorder," and

> [a]dditionally, there must be verification in the Presentence Investigation (PSI) report or other similar documents in the central file which supports the diagnosis.

(Id.)

## D. Taylor's Motion to Correct and/or Amend Presentence Investigation Report

On August 19, 2003, Frank Taylor filed a pro se motion in this Court asking that his presentence report be amended to reflect that he was abusing alcohol and marijuana "up until the time of his arrest in this matter." (Defendant's Motion to Correct and/or Amend Presentence Investigation Report ("Taylor's Motion") at 9.) In stating the reason for his motion, Taylor described the difficulty he had been having with the BOP:

> Recently, Defendant Frank Taylor requested to participate in the Residential Drug Abuse Program offered through the Bureau of Prisons, however because his actual substance abuse to alcohol and marijuana does not reflect that he was actually abusing the above substances one (1) year prior to his arrest in this matter when in fact as admitted by Mr. Taylor he still has a detrimental substance abuse addiction as reflected in his past.

(Taylor's Motion at 5-6.) The motion is supported by Taylor's affidavit, which reads as follows:

> I declare under the penalty of perjury that the foregoing [sic] statements are true and correct to the best of my knowledge.
>
> 1. I am the defendant in the matter of United States of America v. Frank Taylor U.S.D.C. No. 01 CR-348-10.

2.  Counsel failed to advise prior to the presentence investigation interview to discuss my substance abuse of alcohol and marijuana up until the time of my arrest in this matter.

3.  I failed to inform the United States probation Department of my substance abuse of alcohol and marijuana because I felt that by divulging my substance abuse problem would [sic] ultimately affect the sentence this Honorable Court would impose.

4.  I readily acknowledge my substance abuse of alcohol and marijuana since or around early as 1970 up until the time of my arrest in this matter.

5.  I feel that additional extensive treatment offered through the Bureau of prisons will greatly assist me in recovery of my substance abuse to alcohol and marijuana when I am released from my term of incarceration, to return to society.

Taylor served the government with a copy of the motion but did not serve the defendants. On September 22, 2003, we called counsel for all parties into chambers and distributed copies of the motion and affidavit to counsel for all defendants. We set a briefing schedule for any motions any defendant wished to file based on Taylor's motion.[3]

### E. **Defendants' Motions**

All defendants have either filed motions and briefs or have joined in the motions and briefs filed by others. Their arguments are similar. Their opening briefs assume, without discussion, that Taylor is telling the truth in his motion and affidavit. As far as the defendants are concerned, it is now a given that Taylor was

---

3/ The briefing schedule on the defendants' appeals from their convictions has been stayed by the Court of Appeals pending decision on the Rule 33 motions.

abusing alcohol and drugs continuously from the 1970s or 1980s up until he began serving his sentence in this case. They argue that his perception of the events in the mid-1990s about which he testified was clouded by his use of drugs and alcohol and that his trial testimony was unreliable due to his drug and alcohol-induced memory loss.

The defendants also argue that the court deprived them of an opportunity to examine Taylor at trial concerning his use of drugs and alcohol, so that they were unable to bring to the jury's attention his drug and alcohol dependence.

As an alternative to an order granting them a new trial, the defendants request an evidentiary hearing at which they could elicit evidence concerning Taylor's drug and alcohol abuse and attempt to establish their entitlement to a new trial.

The government opposes the motions on a number of grounds, but its primary response is that there is no evidence to suggest any drug or alcohol abuse by Taylor that would have affected his testimony in this case, and that in fact there is convincing evidence that he had no such problem at any relevant time. The government's position in regard to Taylor's motion and affidavit is that he has "exaggerated" and "embellished" his history of substance of abuse in order to gain entry into the BOP's treatment program and qualify for early release from custody. (Government's

Response at 7-8.)[4]

## DISCUSSION

In <u>United States v. Hodges</u>, 315 F.3d 794 (7th Cir. 2003), the

Court stated the traditional requirements for a new trial based on

newly discovered evidence:

> A new trial is warranted only if [defendant] can show
> that the new evidence: 1) came to his knowledge only
> after trial; 2) could not have been discovered any sooner
> using due diligence; 3) is material and not merely
> impeaching or cumulative; and 4) probably would lead to
> an acquittal in the event of a new trial.

<u>Id.</u> at 801. A similar statement of the requirements is found in

<u>United States v. Young</u>, 20 F.3d 758 (7th Cir. 1994):

> Courts exercise great caution when considering a motion
> under Rule 33 to set aside a verdict on the basis of
> newly discovered evidence because of the importance
> accorded to repose, regularity of decision-making, and
> conservation of judicial resources. <u>United States v.
> Kamel</u>, 965 F.2d 484, 490 (7th Cir. 1992). In a long line
> of cases, this Court has established a four-part test a
> defendant must satisfy to establish his right to a new
> trial. Specifically, the defendant must show that the
> evidence upon which he relies:
>
> > (1) came to his knowledge only after
> > trial; (2) could not have been discovered
> > sooner had due diligence been exercised;
> > (3) is material and not merely impeaching
> > or cumulative; and (4) would probably
> > lead to an acquittal in the event of a
> > new trial.
>
> <u>Id.</u> (quoting <u>Jarrett v. United States</u>, 822 F.2d 1438,
> 1445 (7th Cir. 1987)).

<u>Id.</u> at 763.

---

4/ In their reply briefs, the defendants scoff at this euphemistic
language the government uses to describe what, if the government's view is
correct, are nothing less than outright lies by Taylor.

The defendants argue that this four-part test should not apply to this case but that instead we should apply the less demanding standard approved in <u>Larrison v United States</u>, 24 F.2d 82, 87-88 (7th Cir. 1928) and restated more recently in <u>United States v. Reed</u>, 986 F.2d 191 (7th Cir. 1993). Under this test, a new trial should be granted when:

(a)   The court is reasonably well satisfied that the testimony given by a material witness is false.
(b)   The jury might have reached a different conclusion absent the false testimony or if it had known that testimony by a material witness was false.
(c)   The party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

<u>Reed</u>, 986 F.2d at 192. It has been pointed out that "[t]he difference between <u>Larrison</u> and the more general formulation has become, over the years, more and more elusive," <u>United States v. Mazzanti</u>, 925 F.2d 1026, 1029 (7th Cir. 1991), but the result in a particular case could turn on the difference between the requirement that the newly discovered evidence would <u>probably</u> lead to an acquittal in the event of a retrial and the <u>Larrison</u> requirement that without the false evidence the jury <u>might</u> have reached a different conclusion. "Probably" is certainly more demanding than "might."[5] But the important difference in the two

---

5/   The Seventh Circuit has noted, however, that the "might" test of <u>Larrison</u> would not be satisfied by a mere possibility that the jury might have been influenced by false testimony:

<u>Larrison</u> cannot be interpreted to mean that false testimony will require a new trial if it is at all possible that a jury could reach a different result: a different jury "might" reach a different

tests as far as this case is concerned is that <u>Larrison</u> looks back to materially false testimony a witness gave, whereas the four-part test addresses the situation where newly discovered evidence, although not necessarily contradicting anything that was said at trial, could nonetheless bring about an acquittal at a new trial. A grant of a new trial in that situation is governed by the four-part test and requires that the new evidence would <u>probably</u> lead to an acquittal in the event of a retrial.

Taylor was not asked any question at trial as to whether he had used drugs or alcohol during the time period of the fraud against the Town in the 1990s or at any time thereafter. He gave no testimony at all on that subject, let alone false testimony. Therefore, the threshold requirement of the <u>Larrison</u> test--that the court be "reasonably well satisfied that the testimony given by a material witness is false"--cannot be met, and <u>Larrison</u> has no application here.

What we have, if anything, is a situation for which the four-part test is the appropriate standard. We turn, then, to the question of whether defendants have met the requirements of that test.

---

> result even if the evidence presented was the same. The likelihood that the false testimony played a determinative or substantial role in the jury's verdict must be greater than that, although less than the general standard that, on retrial, the new evidence would probably lead to acquittal. We do not today further define the <u>Larrison</u> standard, but simply hold that it was clearly not met here.

United States v. Van Daal Wyk, 840 F.2d 494, 500 (7th Cir. 1988).

## A. Whether the Defendants Became Aware of the Evidence Only After Trial

The evidence in question is the motion and affidavit of Taylor (together with the papers he submitted to the BOP in support of his request for admittance to the drug program). The defendants obviously did not become aware of this evidence until after trial, so the government concedes that defendants have satisfied this first part of the test.

## B. Whether the Evidence Could Have Been Discovered Sooner Using Due Diligence

The government's position is that "[i]f Taylor was addled by alcohol abuse during [the] period of the fraud scheme, defendants surely should have noticed his impaired condition." (Government's Response at 6.) The government points out how various of the defendants worked closely with Taylor and would have been likely to notice signs of excessive drinking and any impairment in his mental process, physical condition or job performance that might have been caused by alcohol or drugs.

We think there is something to the government's point. If Taylor was in fact using drugs or alcohol to the extent that he was having difficulty perceiving and remembering things at the time of the events in question, it seems likely that at least those defendants who worked closely with him would have known it and would have brought it out at trial.

## C.   Whether the Evidence is Material
## and Not Merely Impeaching or Cumulative

There are actually three separate questions here: whether the evidence is material; or, on the other hand, merely impeaching; or cumulative.

### 1.   **Material**

"Material" evidence, as opposed to impeachment evidence, is "substantive evidence of the defendants' guilt or innocence." United States v. Jackson, 780 F.2d 1305, 1313 (7th Cir. 1986). See also United States v. Reed, 2 F.3d 1441, 1451 (7th Cir. 1993) ("Moreover, because the allegation merely goes to impeaching Ross and is not material to the offense for which Reed was convicted, it does not warrant a new trial.").

Clearly, Taylor's alleged drug and alcohol use is not material to the offenses for which the defendants in this case were convicted. It goes merely to impeach Taylor.

We conclude, therefore, that defendants' newly discovered evidence is not material.

### 2.   **Impeaching**

Evidence of Taylor's drug or alcohol use would be admissible to impeach him if there were a legitimate issue as to his memory or mental capacity. It would not be admissible if "offered solely as a general character attack." United States v. Mojica, 185 F.3d 780, 788 (7th Cir. 1999); United States v. Robinson, 956 F.2d 1388, 1397 (7th Cir. 1992). The evidence proposed by defendants would

have no purpose other than to impeach Taylor by casting doubt on his ability to perceive and remember events, a classic method of impeachment.

Defendants argue that we should be guided by language in United States v. Taglia, 922 F.2d 413, 415 (7th Cir. 1991), to the effect that there is nothing in Rule 33 that "supports a categorical distinction between types of evidence." We believe defendants have taken this language out of context. As the government points out in its response, Taglia goes on to give an example of a situation where a hard and fast distinction would not make sense:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted.

Id. at 415.

The Court continued:

> Of course it will be the rare case in which impeaching evidence warrants a new trial, because ordinarily such evidence will cast doubt at most on the testimony of only one of the witnesses.

Id. The Court held that there was substantial evidence of the defendants' guilt aside from the testimony of the witness who would have been impeached at a new trial by the newly discovered evidence, and the convictions were therefore affirmed.

We are not dealing with anything like the hypothetical case

posited in <u>Taglia</u>, where the conviction was assumed to rest solely on the uncorroborated testimony of a single witness shown by newly discovered evidence to have been a serial perjurer. In our case, the only known instances of Taylor's perjury were brought to the jury's attention, and, furthermore, there was substantial corroboration of his testimony. Finally, the Seventh Circuit has made it clear that, however the hypothetical in <u>Taglia</u> might be handled should it ever arise, the general rule is still that newly discovered evidence that is merely impeaching is not a ground for a new trial. <u>See</u> <u>United States v. DePriest</u>, 6 F.3d 1201, 1217 (7th Cir. 1993).

Our conclusion is that the newly discovered evidence offered by the defendants is merely impeaching and, in the circumstances of this case, not a ground for a new trial.

### 3. **Cumulative**

The government argues that because Taylor's testimony was impeached by extensive evidence of his tendency to lie, the newly discovered evidence would be merely cumulative. We agree with the defendants, however, that evidence of drug and alcohol addiction would be a different kind of impeachment, not going to honesty, but rather to Taylor's ability to perceive and remember. Therefore, it is not cumulative.

### D. **Whether the Evidence Probably Would Lead to an Acquittal in the Event of a New Trial**

Here, the defendants encounter a number of problems.

Initially, in order to be considered likely to lead to an acquittal, the newly discovered evidence must be admissible. See United States v. Kamel, 965 F.2d 484, 491 (7th Cir. 1992). And the defendants' newly discovered evidence, consisting of Taylor's motion, affidavit and BOP materials, is not admissible because it is hearsay. Although the affidavit is made under penalty of perjury and thus satisfies one requirement of the hearsay rule, the statements in the affidavit were not subject to cross-examination by the government and are hearsay for that reason. See Stokes v. City of Omaha, 23 F.3d 1362, 1366-67 (8th Cir. 1994); United States v. Fernandez, 892 F.2d 976, 980-81 (11th Cir. 1989).

We will put to one side the problem of admissibility and assume arguendo that somehow the jury in a new trial could be informed of the statement in Taylor's affidavit that he was abusing alcohol and marijuana from 1970 up until the time of his arrest "in this matter," and we will assume further that by "this matter" he was referring to this case rather than the earlier Minnesota federal court case. How likely is it that the new jury would believe Taylor's claim, and, if they did believe it, how likely is it that they would find his testimony to be so impeached by doubt as to his ability to perceive and recollect that they would acquit the defendants? We think the answer to both questions is that it would be highly unlikely.

In regard to the credibility of Taylor's claim, the jury would

learn that he tested negative for drugs on numerous occasions from the time of his arrest on the Minnesota case in January of 1999 and at various times thereafter during the pendency of this case (because he was still on supervised release in the Minnesota case). The defendants argue that there are gaps in the time covered by these tests, and that is true. But if Taylor really was abusing marijuana continuously, it is probable that at least some of these tests would have picked it up. None did. Defendants also point out that Taylor was not tested for alcohol, and that is also true. But, if Taylor's claim of marijuana use is discredited by the tests he did take, which we believe it is, it is likely the jury would discount his claim about alcohol as well.

The jury would surely consider whether Taylor had a motive to lie in his affidavit and his statements to the BOP. The defendants have no trouble with the proposition that Taylor had a motive to lie at the trial, but they ignore the obvious motive he had to lie about his history of drug and alcohol abuse. If he got into the drug program, he could reduce his prison time by as much as a year. The jury would not ignore this obvious reason to lie, especially when they would also be aware of his well-established propensity to lie.

The jury would observe Taylor on the witness stand, and there is no reason to think they would see a witness exhibiting signs of drug or alcohol addiction any more than the first jury did.

For these reasons, we think it improbable that a jury in a new trial would believe testimony by Taylor that he abused alcohol and marijuana from 1970 continuously up to the time of his arrest in this case.

In the unlikely event a new jury should believe Taylor had a persistent marijuana and alcohol problem during that period of time, the next question would be whether they would probably acquit the defendants on that account.[6]  For several reasons, we think that result would be highly improbable.  The question, again, is not whether the jury would think the drug and alcohol use reflected badly on Taylor's character, because that is not the purpose for which the evidence would be received.  It would be received only for impeachment as to the reliability of his mental processes.  At the time of the events in question, was he perceiving them through a haze of alcohol or marijuana intoxication?  At the time he would be testifying at a new trial--perhaps some time in the year 2004-- would his memory of those events be disoriented by alcohol and marijuana use?[7]

In their memoranda, the defendants tend to conflate the question of substance abuse with the question of Taylor's generally bad character and his tendency to lie.  They are different

---

6/  "Probably" in this Rule 33 context means "more likely than not." United States v. Woods, 169 F.3d 1077, 1078 (7th Cir. 1999).

7/  If Taylor were brought from prison to testify, presumably the last such use would have been before he began serving his sentence in this case.

questions. The defendants' Rule 33 motions present newly discovered evidence pertaining to Taylor's ability to perceive and remember, not new evidence of bad character or a tendency to tell lies. Yet the defendants' memoranda devote considerable space to matters on which they claim Taylor lied, not matters as to which he could have been simply mistaken or confused. At trial, whenever Taylor was shown to have been inaccurate about something, the defendants charged him with lying. Now those same inaccuracies are cited to support the view that a new jury would discount virtually the entire body of Taylor's incriminating testimony because he could have been mistaken in his perception and memory of events.

There is no evidence to suggest that Taylor was experiencing any mental disability of any kind due to drugs or alcohol during the period of the fraud against the Town. The defendants do not seem to realize it, but they acknowledge this by their descriptions of Taylor's activities during that time (which they provide in order to show the importance of Taylor as a government witness). The following quotation from the memorandum of defendant Betty Loren-Maltese is obviously descriptive of a person in full command of his mental faculties:

> The importance of Taylor to the government's case cannot
> be understated [sic]. Taylor was the ultimate insider
> and one of the originators of the alleged scheme to
> defraud. He admitted that he unilaterally conceived the
> terms of the financial relationship between SRC and the
> Town and drafted the document purporting to memorialize
> that contract. He alone negotiated SRC's capitation fee
> with Town officials and was SRC's primary contact with

the Town.  Although he said that it was not his original
intention to cheat the Town, he admittedly put "every
conceivable fee" into the contract.  Taylor implemented
the 20% "add-ons" to the third-party administrator
expenses as a way to conceal excessive fees.  It was his
idea, and on his direction, that SRC charged what he
claimed at trial were fraudulent "inspection fees,"
"policy fees" and "audit fees."  He later conceived and
implemented the idea of creating a subsidiary to bring
the third-party administration work in-house to SRC.  He
also instituted a Town "safety program" as a means to
obtain additional funds for SRC.  And when the Town's
auditors came calling, Taylor was usually the primary
contact.  Indeed, he admitted to working with cooperating
witness Greg Ross to create phony invoices to support
SRC's expenses with the auditors.  Taylor also claimed to
be at the center of the subsequent disbursement of the
proceeds through the use of Specialty Finance, Inc.,
including by the making of "loans" to his own friends and
family members.  Of course, in exchange for his central
role in this scheme, Taylor admitted to receiving
hundreds of thousands of dollars.

(Defendant Betty Loren-Maltese's Motion and Memorandum of Law

Pursuant to Rule 33 to Vacate the Judgment and Grant a New Trial

("Loren-Maltese's Motion"), at 11-12.)

Aside from the substantial evidence indicating that Taylor was

functioning efficiently during the period of the fraud, there is

another important reason why a new jury would be unlikely to acquit

on the basis of any claim by Taylor that he was using marijuana and

alcohol during that time.  His testimony concerning the fraud and

the conduct of the various defendants is corroborated to a very

substantial extent by the testimony of other witnesses, a wealth of

documentary evidence, and persuasive circumstantial evidence.

Moreover, there is evidence of the fraud and of the participation

of each of the defendants that is quite independent of Taylor's

testimony. We will not extend this opinion by recounting this evidence, but will simply refer to the government's response at 11-18, which contains a fair summary of it.

For these reasons, we conclude that the fourth requirement of Rule 33, that the newly discovered evidence probably would lead to an acquittal in the event of a new trial, has not been satisfied.[8]

## E. **The Defendants' Alternative Motion for An Evidentiary Hearing**

The defendants seek an evidentiary hearing at which they would be able to examine Taylor concerning his substance abuse. In essence, they want to conduct what would amount to a discovery deposition in the hopes of discovering some new evidence that would comply with the requirements of Rule 33. We think there is no precedent for this kind of exercise, even if it be assumed that Taylor would testify and would state that he had substance abuse problems at relevant times that had interfered with his perception and memory.[9] The hearing would be a waste of time. There is just too much evidence to the contrary. Taylor knew what was happening during the period of the fraud, and when he testified at trial, his lapses of memory were no more numerous than would be expected of

---

8/ We note incidentally that Taylor has filed a motion to "withdraw" his "Motion to Correct and/or Amend Presentence Investigation Report." The BOP has granted his request for admission to the drug program without requiring any amendment of the presentence report.

9/ The defendants are perhaps being overly optimistic in assuming that Taylor would testify at all. A question that has arisen in regard to Taylor's motion and affidavit, as the defendants point out in their memoranda, is whether Taylor has committed perjury in the affidavit. We know of no reason he would not be entitled to claim his privilege against self-incrimination at this point and refuse to testify.

any witness testifying about matters that had occurred a decade earlier. The defendants were correct at trial: it was a question of whether Taylor was lying or whether he was doing his best to the tell the truth. The jury found him to be credible, and there is no reason to believe that the defendants could develop anything at an evidentiary hearing that would be likely to result in an acquittal the second time around.

Our position on an evidentiary hearing is supported by Seventh Circuit case law. In Taglia, the Court made an observation that we believe is applicable here:

> We add that neither under Rule 33 nor under section 2255 is a hearing mandatory in all cases; if there is no reason to suppose that a hearing would produce evidence justifying the grant of a new trial, there is no reason to hold a hearing.

922 F.2d at 419 (citations omitted). See also Jackson, 780 F.2d at 1313; United States v. Hedman, 655 F.2d 813, 817 (7th Cir. 1981) ("The district judge retains discretion to exercise his common sense.")

The request for an evidentiary hearing will be denied.

## F.   Additional Matters

The defendants raise two additional matters that are prompted by their Rule 33 motions in the sense that they arise out of Taylor's motion and affidavit. One issue is whether there was trial error in regard to the cross-examination of Taylor by the attorney for defendant John LaGiglio. The other issue is whether

the government suppressed evidence of Taylor's substance abuse in violation of the Brady/Giglio rule.

### 1. **The Alleged Trial Error**

Mr. Ackerman, the attorney for defendant John LaGiglio, began his cross-examination of Taylor as follows:

MR. ACKERMAN: If it please the Court, may I proceed.

THE COURT: Yes, please do, Mr. Ackerman.

BY MR. ACKERMAN:

Q. Mr. Taylor, it's kind of late in the day. Do you have water? Are you comfortable?

A. Yes, sir.

Q. Good. With a little luck I won't show you a single document. Is that okay with you?

A. Yes, sir.

Q. I'd like to discuss, first of all, memory. May we do that?

A. Yes, sir.

Q. Is it your testimony that you have a photographic memory?

A. No, sir.

Q. Is it your testimony before this jury that you have a perfect memory?

A. No sir.

Q. Is it fair to suggest that we're talking about events going back 10, 9, 8 years ago?

A. Yes, sir.

Q. And is it fair to say that as to you and as to all of us there is a lot of water that's crossed the bridge

since eight years ago?

A. Yes, sir.

Q. Is that true?

A. That's correct.

Q. So what you're doing is you're providing us with your very best recollections going back a decade, is that about right?

A. That's about right, yes, sir.

Q. Now, memory is impacted by any number of things, an automobile accident, a knock on the head, substance abuse. Would you agree that any of those things can impact on memory?

A. Yes, sir.

Q. And without getting terribly personal, have you [sic] any of those occurrences been part of your life?

[ASSISTANT U.S. ATTORNEY] SCHNEIDER: Judge --

MR. ACKERMAN: This goes to memory, if the Court please.

MR. SCHNEIDER: --I object. I object.

THE COURT: Sustained.

MR. SCHNEIDER: I think there's no basis for any of this.

THE COURT: This is something we'd have to go into --

MR. ACKERMAN: I'd be glad to.

THE COURT: Well, this is the kind of thing that you should let me know about before now.

MR. ACKERMAN: Well, Your Honor, it's somewhat important to me.

THE COURT: If it was important enough, you should have gone into it beforehand, but continue with something else and then we'll double back here. I mean, I'll take a recess and we'll talk about this. But as you well know

it's an area that is sometimes appropriate to inquire into but other times not, and I have no idea. So, I'll just have to hear from you but outside the presence of the jury.

MR. ACKERMAN: Surely.

BY MR. ACKERMAN:

Q. In any event, Mr. Taylor, you will agree that certain events in one's life impacts on memory?

A. Yes, sir.

Q. And depending on the event, occurrence, or background, it can seriously impact memory or just marginally, or not at all. Is that fair to say?

A. Yes, sir.

Q. Is there a difference between making a mistake and telling a lie when you're talking to people in your opinion?

A. Yes, sir.

Q. And if you make a mistake even under oath before a jury about some fact or event, is that necessarily a lie or perjury or could it just be a mistake?

A. I believe it could be a mistake.

. . . .

MR. ACKERMAN: Your Honor, I would ask to stop at this point. I'd like to take up the other matter with you, and I'll certainly --

THE COURT: Have you run out of gas otherwise?

MR. ACKERMAN: I'm tired, Judge.

THE COURT: All right.

MR. ACKERMAN: No sense in beating around the bush. I'm tired and Mr. Taylor --

THE COURT: Okay. All right. Well, maybe we all are.

Let's recess then for the evening, and we'll resume 9:30
Thursday morning.

(Jury excused.)

(Loren-Maltese's Motion, Ex. C, Transcript of Proceedings of June

11, 2002 ("Tr."), at 2250-52, 2271.)

When the jury left the courtroom, the following occurred:

THE COURT: Mr. Ackerman.

MR. ACKERMAN: Your Honor, I had thought that the
government would never have a problem with what I was
going to ask, which has to do with the history of alcohol
and substance abuse that this witness suffered, although
not at – and I'll make this quite clear, not at the time
that he was involved with SRC.  There is no suggestion in
any of the material that during the time frame from '92
forward he was suffering from any substance or alcohol
abuse.
    However, I can make a good faith proffer to the
effect that prior to sometime earlier in the 1980s, as I
recall, he did suffer from alcohol abuse, became a member
of Hay Market and has been clean ever since.  But from
the standpoint of -- here was all I was getting at, Your
Honor, from the standpoint of what substance abuse can do
to an individual's memory, even though they are a
recovering abuser is what I was talking about there,
nothing more.  And I wasn't doing it to -- as a matter of
fact, I was about to congratulate him, assuming he would
have said that he's been in recovery for X years and so
forth, because -- I'll say no more.  That's where I was
going.

(Tr. at 2271-72 (emphasis added).)

There followed a discussion about whether Mr. Ackerman would

make an offer of proof.  We concluded that he in fact had nothing

to offer, and the matter was dropped until the following day, when

we reviewed with counsel the applicable law concerning impeachment

by proof of substance abuse.  We asked whether anyone had found any

cases relevant to Mr. Ackerman's examination, and there was no response. We cited Mojica, 185 F.3d 780, as well as other cases, for the proposition that such examination is proper only when the memory or mental capacity of the witness is legitimately at issue, and it is not permitted where the purpose is a general character attack. (Tr. at 2280-84.) We informed counsel we would instruct the jury that Mr. Ackerman's question would be stricken and they should disregard it. (Tr. at 2286-87.) We also asked for Mr. Ackerman's comment on that:

Mr. Ackerman?

MR. ACKERMAN: I understand your ruling, but I believe the witness could reasonably testify that traumatic instances, such as an automobile accident or injury, could impact memory, leaving alone anything to do with drug or alcohol abuse.

THE COURT: I thought that Mr. Taylor's training was in insurance.

MR. ACKERMAN: It is.

THE COURT: I hadn't heard about his medical degree. He will not be permitted to give a medical opinion.

MR. ACKERMAN: Very well.

THE COURT: Anything else?

[ASSISTANT U.S. ATTORNEY] MARS: Well, Judge --

MR. DURKIN: You do know that Mr. Ackerman goes by Dr. Ackerman?

THE COURT: As a matter of fact, if you people were practicing in Europe, you would all be doctor[s] because lawyers are doctor[s] over there.

MR. SALERNO: I was going to be a doctor, but I didn't

have the patients.

(Tr. at 2287-88.)  Government counsel had a suggestion for the phrasing of the instruction to the jury, and we agreed to adopt it. (Tr. at 2288-89.)

The jury was then brought into the courtroom, and we gave the following instruction:

> THE COURT:  During Mr. Ackerman's cross of Mr. Taylor, there was a statement made by Mr. Ackerman, or maybe it was in the form of a question, I don't recall exactly, but either the statement or the question contained some reference to automobile accidents, bumps on the head, alcoholism[10] and substance abuse. An objection was made. I sustained the objection. I said I would take it under advisement.
> I have taken it under advisement. I made an inquiry into the matter, and I have determined there was no basis for the statement or the question, whatever it was. Therefore, I am striking that material and the jury will disregard it just as though it never happened.  All right?
> Mr. Ackerman, will you continue please.
>
> MR. ACKERMAN:  Thank you.

(Tr. at 2290.)

The defendants argue that it was error to restrict Mr. Ackerman's cross-examination and that they were prejudiced by the restriction, as indicated by the newly discovered evidence of Taylor's substance abuse.  (The defendants assume that, had Mr. Ackerman been permitted to continue, Taylor would have disclosed the substance abuse he claims in his motion to amend his presentence report.)  Secondly, the defendants argue that they were

---

10/  This reference to "alcoholism" was in error.  In fact, Mr. Ackerman's question had not included any reference to alcoholism.

unfairly prejudiced by the court's instruction to the jury.

Neither of the arguments has merit. The question Mr. Ackerman asked, and his proposed follow-up questions, had nothing to do with any substance abuse by Taylor that would have affected his perception or memory of the facts about which he testified. As Mr. Ackerman made clear in our colloquy, he had no evidence of any current use of alcohol, or any use of alcohol at the time of the events in question. He had no evidence at all of the abuse of any other substance. He wanted to inquire about Taylor's use of alcohol long before the events in question, and wanted to "congratulate" Taylor on having been able to quit drinking. How this would have impeached Taylor is beyond us, and we believe we were correct in putting a stop to the questioning as a waste of time. But we believed the government's case had been prejudiced by the mere asking of the question. The seed had been planted.

The next day, when discussing the law, we pointed out that in all of the cases we had found, before counsel had asked any question in the presence of the jury there had been a voir dire on the matter so that the court could rule in advance on the propriety of the inquiry. Here, the court and government counsel were blindsided by a question that came out of the blue, mentioning "substance abuse" as behavior that can affect memory. Clearly, the question was improper. Mr. Ackerman, although given an opportunity, was unable to provide any justification for it, and

the objection was properly sustained.

As to whether the court's instruction to the jury was unfair, the defendants argue that in telling the jury there was "no basis" for Mr. Ackerman's question, we were saying that Taylor had not abused drugs in a way that would impeach his testimony. Before we gave the instruction, we told the parties the gist of what we were going to say, and no one representing any defendant made an objection or offered any suggestion concerning the proposed instruction.

In any event, we see no unfair prejudice to the defendants in our telling the jury that there was no basis for the question. Had the question not been asked in the first place, the notion that Taylor was a drug abuser would never have been suggested to the jury. But it was suggested, and the suggestion was entirely improper. Simply telling the jury to ignore the question would not have been sufficient. The fact that the question had been asked could still have caused them to suspect that Taylor was addicted to drugs and that the addiction affected his memory. We thought then, and still think, that it was necessary to go further and tell the jury that there had been no basis for asking the question. We disagree with the defendants' argument that they were entitled to have the matter left hanging in the minds of the jury. That is not our idea of fairness.

It is obvious that these issues concerning Mr. Ackerman's

question have arguable significance only in light of Taylor's
motion and affidavit. At the time, no defense attorney other than
Mr. Ackerman uttered a word in support of the notion that his
question to Taylor was proper. While we had a stipulation that
throughout the trial all defense counsel would be considered as
having joined in every objection, argument, or motion made by any
defense counsel, that only meant that counsel joined in the motions
and arguments that were actually made. Mr. Ackerman made no valid
argument and therefore there was no valid argument for the other
defendants to adopt. Nor was there any objection to the jury
instruction for them to adopt.

Another indication that this matter was not considered
significant at the time is the fact that none of the defendants,
not even John LaGiglio, mentioned it in their post-trial motions.

We believe that no error was committed, and certainly there
was no error that was prejudicial to the defendants.

## 2. **The Brady/Giglio Argument**

Finally, some of the defendants argue that the government must
have known that Taylor abused drugs and alcohol at times relevant
for impeachment purposes and failed to disclose that fact to the
defense. Were this true, it would be a violation of the
government's obligation under Brady v. Maryland, 373 U.S. 83 (1963)
and Giglio v. United States, 405 U.S. 150 (1972), to disclose
evidence favorable to the defense. But there is no basis even to

suspect that there was a violation of this obligation. Even if Taylor's affidavit about his use of alcohol and marijuana were credible, which it is not, he does not say that he told the government about it, and there is no evidence that he did.[11]

### CONCLUSION

The motions of the defendants for a new trial based on newly discovered evidence are denied. Their alternative motions for an evidentiary hearing are also denied.


DATE:       December 29, 2003


ENTER:      _____
            John F. Grady, United States District Judge

---

[11] Considering that Taylor told the probation officer who prepared his presentence report that he had stopped abusing drugs and alcohol in 1980, it is improbable that he would earlier have told the prosecutors something different.